IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

BLAKE JONES                                                                    PLAINTIFF

v.                              CASE NO. 5:17-CV-5147

MCKEE FOODS CORPORATION                                          DEFENDANT

## MEMORANDUM OPINION AND ORDER

Currently before the Court is a Motion for Summary Judgment (Doc. 20) filed by Defendant McKee Foods Corporation ("McKee"). Plaintiff Blake Jones has filed a Response in Opposition (Doc. 23). For the reasons explained herein, the Motion for Summary Judgment is **GRANTED**.

### I. BACKGROUND

Blake Jones began working for McKee as a temporary employee in December of 2012. In July of 2013, he was hired as an official McKee employee to work in the Environmental Services Department as a janitor. He ultimately transitioned into working as a load team member, initially on second shift but eventually on third shift.[1]

On September 17, 2016, Jones applied for intermittent Family and Medical Leave Act ("FMLA") leave. McKee granted this request, and his leave period was approved retroactively to August 17, 2016. Jones' leave was scheduled to run for a period of six months, at which point he would need to seek re-certification. Jones began taking FMLA leave on an intermittent basis—as he deemed necessary for his underlying medical needs However, individual FMLA absences within the approved intermittent window required

---

[1] At McKee, third shift runs from 10:30 p.m. until 6:30 a.m. (Doc. 23-3, p. 5).

1

notice and documentation. According to the evidence in the record, McKee corporate policy required employees taking FMLA leave to: 1) call their supervisor, 2) call the Medical Leave Clerk, and 3) call the FMLA line to report details of their absence from the job. Otherwise, any absences would not be considered "FMLA leave." (Doc. 20-3, p. 2).

## —The January 3rd Leave—

In the middle of his overnight shift on January 3, 2017, Jones told another McKee employee, Dallas Cheeks,[2] that he was ill and planned to leave his shift early. However, he did not leave immediately because Jackie Smithson, a shift clerk, informed Jones that there was an important shipment that had to be out by a certain time and asked him whether he could finish the last few cases left to complete the trailer-load. (Doc. 23-2, p. 10). Jones agreed to do so. After he finished the trailer, Jones then went by the nurse's station to document his FMLA leave, but left without speaking to the nurse when he saw the number of people waiting to see her. Nor did Jones tell Jason Nichols, his direct supervisor, that he was taking leave. Jones does believe that he called the FMLA line to report leaving early. A month later, on February 7, 2017, Jones received a First Written Counseling (Step 1)[3] for leaving early on January 3rd without notifying a supervisor. Jones stated in his deposition that he believed that McKee also charged him with an "attendance point" for taking FMLA leave on January 3rd, but the McKee Attendance Points printout for him shows that he received no attendance points in connection with this event. (Doc. 20-6, p. 2).

---

[2] Jones contends that he was instructed that Cheeks was to be respected and that his direct supervisor, Jason Nichols, told him that Cheeks had the same authority as Nichols. Nichols disputes this.

[3] McKee policy establishes four levels of disciplinary action, with a Step Four being the highest level (Suspension and possible Termination).

## —Leaving Company Property Without Permission—

On February 2, 2017, unbeknownst to Jones, another McKee employee, Kelby Jones, reported to the shipping coordinator, Ronnie Hendrickson, that he saw Jones off of company property during his shift. Because McKee shipping department employees don't clock in and out for breaks or for lunch, they are required to remain on company property for the duration of their shift—unless they clock out. Intentionally being off company property on company time is considered "intentionally defrauding the company." See Doc. 20-9, p. 2. This report was passed to Gary Ruebush, McKee HR Business Partner, and Bob Tharp, McKee Shipping Superintendent, who allegedly decided to investigate the matter themselves.[4]

On the morning of February 7, 2017, Tharp and Ruebush arrived at the McKee plant early so that they would have a vantage point of the parking lot and any employees who were exiting the building. At around 2:10 a.m., they reported observing Jones leave the building, get into his car (a red Hummer), and then drive off company property. Ruebush then left Tharp, got into his car, and drove off the lot to confirm that it was Jones who was driving in the car. It is not clear from the record whether Ruebush was successful in confirming Jones' identity. Nevertheless, once back at McKee, Ruebush pulled the log that shows when employees swipe their badges to get in and out of the building. From these logs, Ruebush was able to determine that Jones had swiped in and out of the

---

[4] The McKee nomenclature is a bit confusing. But, it appears that the hierarchy is as follows: Jones reported directly to Jason Nichols, who reported to Bob Tharp. Ruebush is the HR Business Partner assigned to that department, so he and Tharp are colleagues. They both in turn report to Melissa Smith, the HR Manager.

building around the same time he and Tharp observed Jones leave the property, and further confirmed that Jones had not clocked out.

Because Jones' actions were considered by Tharp and Ruebush to be serious misconduct (*i.e.* defrauding the company), the decision was made to suspend him. On February 12, 2017, Ruebush and Nichols met with Jones to inform him that he was receiving a Suspension (Step Four). Pursuant to McKee policy, employees who are suspended are entitled to a suspension interview, where McKee officers interview the employee to get his/her side of the story. Then, the company convenes a suspension committee, which is composed of the employee's direct supervisor, the superintendent, the department manager, the HR business partner, and the HR manager. During the suspension hearing, the committee discusses the reasons for the suspension, hears the employee's story, and then ultimately votes whether to release, retain, or transfer the employee. (Doc. 21, p. 5).

During the February 17, 2017 suspension review meeting, Jones insisted that he did not recall ever leaving company property while on the clock and asserted that he had not driven his red Hummer that night. In other words, Jones' statement to the suspension committee was completely at odds with the two eyewitness accounts that had resulted in his suspension. The committee[5] unanimously decided to terminate Jones' employment with McKee.

---

[5] The Committee consisted of Melissa Smith (HR Manager), HR Business Partner (Gary Ruebush), Department Manager (Philip Cameron), Superintendent (Bob Tharp), and the employee's Direct Supervisor (Jason Nichols). It should be noted that the Department Manager for Jones' department was actually Greg Sutherland, but Philip Cameron, the manager of the Engineering Department, filled in.

4

### —After-Acquired Evidence—

Separate and apart from this investigation, officials with McKee apparently had also begun to investigate Jones for a number of other reasons. Three in particular bear upon the arguments made at summary judgment. The first was an investigation into the possible falsification of certain records that Jones submitted in conjunction with his FMLA paperwork that said that he had experienced trauma in the military. According to certain other of McKee Foods' records, Jones had no history of military service. (Doc. 23-4, p. 6). The second was an investigation prompted by other employees' complaints that Jones was misusing FMLA leave. Finally, a few days before Jones was terminated for leaving company property without clocking out, Gary Ruebush had started an investigation over complaints by Jones' coworkers that he was making improper comments, including allegedly telling one coworker that he was about to leave to go take FMLA leave but that he shouldn't worry because Jones would be done with that coworker's wife before he got home. McKee argues that, to the extent any of Jones' claims survive summary judgment, the evidence revealed by this investigation would limit his recovery under the after-acquired evidence doctrine because Jones would have been terminated shortly thereafter for these inappropriate comments.

### —Jones' Allegations of Harassment—

In the midst of these incidents and investigations, Jones alleges that he experienced harassment and discrimination at the hands of fellow employees, who were upset that his missing work would increase their workloads. He alleges that numerous coworkers made derogatory comments about him frequently taking off. He also contends that his supervisor Jason Nichols would ask him questions about his attitude and would

sometimes comment that he didn't look sick when Jones would ask to take his leave. It is undisputed that McKee had knowledge of various complaints that Jones had made regarding these comments. While it appears that no formal investigation of these incidents was ever undertaken by McKee, Nichols did, however, hold a formal staff meeting with his crew, explaining to them the importance of FMLA leave and the fact that Jones was protected under federal law. (Doc. 20-4, p. 11).

Jones filed the instant lawsuit against McKee on August 2, 2017. He contends that he was discriminated and retaliated against for taking FMLA leave. In particular, he contends that he was treated differently (*i.e.* terminated) from other similarly situated employees who violated the same policy, and that the reason why he was terminated and they were not is because of the added strains on the department caused by his FMLA leave.[6]

## II. LEGAL STANDARD

The standard for summary judgment is well established. Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in the light most favorable to the

---

[6] He also initially asserted a claim for wrongful discharge under Arkansas law. Jones claims that he made an anonymous complaint to the Occupational Safety and Health Administration ("OSHA") about alleged safety violations at McKee. During his suspension hearing, Jones told the committee that he was the one who made the complaint. He contended that his firing at the conclusion of that meeting was sufficient to establish a claim for wrongful termination in violation of Arkansas public policy. However, Jones' counsel informed the Court via email on February 26 that he was no longer pursuing this claim. The Court has construed this communication as a motion for voluntary dismissal of that claim. Therefore, under Federal Rule of Civil Procedure 41(a)(2), Jones' claim for wrongful termination in violation of Arkansas law is **DISMISSED WITHOUT PREJUDICE**.

opposing party and give that party the benefit of any inferences that can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l. Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999).

Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). However, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to survive summary judgment. *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Rather, in order for there to be a genuine issue of material fact that would preclude summary judgment, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). To meet its burden, "[t]he nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a Court should not adopt that version of the facts

for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III. DISCUSSION

In general, employees who meet certain statutory requirements are entitled under the FMLA to take twelve weeks of leave from work during any twelve-month period. 29 U.S.C. § 2612(a)(1). In addition to guaranteeing these benefits, the FMLA also prohibits two broad categories of employer conduct. Section 2615(a)(1) makes it unlawful "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). It also makes it unlawful for an employer to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" under the FMLA. 29 U.S.C. § 2615(a)(2). In light of these two sections, the Eighth Circuit has recognized three types of FMLA claims: entitlement claims, retaliation claims, and discrimination claims. *See, e.g., Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012). Because Jones did not specify which of these three subsets of FMLA claims he is pursuing,[7] the Court will consider each type of claim.

### A. FMLA Entitlement Claim

Under 29 U.S.C. 2615(a)(1), an FMLA entitlement claim "occurs where an employer refuses to authorize leave under the FMLA or takes other action to avoid responsibilities under the Act." *Pulczinski*, 691 F.3d at 1005.

---

[7] The Complaint (Doc. 1) uses the words "retaliation" and "discrimination" several times throughout. As such, the Court assumes that Jones is primarily advancing FMLA retaliation and FMLA discrimination claims. Out of an abundance of caution, however, McKee has briefed all three types of claims, and the Court will follow suit.

The undisputed facts in the record establish that McKee never once refused to authorize Jones to take FMLA leave. Indeed, Jones himself testified during his deposition that the only incident he could recall that might potentially qualify under this prong was his belief that McKee assessed him an "Attendance Point" for the incident recounted above that occurred on January 3. (Doc. 23-2, p. 6). Other than that, he testified that he could recall no other instance where McKee ever denied him leave under the Act or attempted to avoid responsibilities under the Act (here—denying him the leave time). *See id.*

Jones' testimony about the incident on January 3rd is insufficient to sustain an FMLA entitlement claim. First, as the Court noted above, despite his belief that he might have received an attendance point as a result of the event on the 3rd, the McKee Attendance Point sheet summary for him shows that the incident wasn't even reported as an "incident" that could potentially have gained Jones a point. (Doc. 20-6, p. 2). There certainly is no evidence in the record—beyond mere speculation—that a point was ever awarded for Jones' use of FMLA leave on that day. In fact, the record evidence squarely contradicts this speculation. Second, the law is well established that an FMLA entitlement claim will not lie "unless the employee has been prejudiced by the violation." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002). Jones' deposition testimony clearly establishes that McKee granted him FMLA leave every time he asked for it—including on the day of January 3rd. Because Jones has not demonstrated that McKee ever denied him the benefits he was entitled to under the FMLA, any FMLA entitlement claim fails. To the extent that Jones' Complaint advanced such a claim against McKee, it is **DISMISSED WITH PREJUDICE.**

## B. FMLA Discrimination and Retaliation Claims

Under 29 U.S.C. § 2615(a)(2), a FMLA retaliation claim occurs when an employer takes some adverse action against an employee after that employee complains about or opposes a practice made unlawful by the Act. *Pulczinski*, 691 F.3d at 1006. An FMLA discrimination claim, on the other hand, "arises when an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA." *Id.*

Because these two claims, unlike an FMLA entitlement claim, have at their core the notion that an employer has discriminated in some way against an employee *because* they were taking FMLA leave, they require evidence that the employer acted with discriminatory intent. *Brown v. City of Jacksonville*, 711 F.3d 883, 891 (8th Cir. 2013). As such, for both of these claims, a court first looks to see whether the plaintiff has pointed to direct evidence of this kind of discrimination. Absent direct evidence, both of these claims are analyzed under the traditional *McDonnell Douglas* burden-shifting framework. *See, e.g., Sisk v. Picture People, Inc.*, 669 F.3d 896, 899 (8th Cir. 2012) (explaining the use of the *McDonnell Douglas* framework for FMLA retaliation claims); *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1015 (8th Cir. 2013) (explaining the similar process for FMLA discrimination claims).

Under the burden-shifting framework used for both claims, a plaintiff must first establish a *prima facie* case of discrimination or retaliation by "[showing] that [he] exercised rights afforded by the Act, that [he] suffered an adverse employment action, and that there was a causal connection between [his] exercise of rights and the adverse employment action." *Phillips v. Mathews*, 547 F.3d 905, 912 (8th Cir. 2008) (quoting *Smith*

*v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002)). If he successfully makes out a *prima facie* case, the burden then shifts to the employer to "articulate a legitimate, nondiscriminatory reason for its challenged actions." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006). "The employee may then demonstrate that the proffered reason is pretextual, showing that 'the employer's proffered explanation is unworthy of credence' or 'persuading the court that a prohibited reason more likely motivated the employer.'" *Hudson v. Tyson Fresh Meats, Inc.*, 787 F.3d 861, 867 (8th Cir. 2015) (quoting *Stallings*, 447 F.3d at 1050).

Jones has not pointed to, and the Court has not found, any direct evidence of McKee's discriminatory intent in the record. Therefore, the Court will analyze these claims under the *McDonnell Douglas* framework.

Here, even assuming that Jones stated a *prima facie* case of discrimination or retaliation, his claims fail because McKee has advanced a legitimate, non-discriminatory reason for terminating Jones, and Jones has not established that the proffered reason for his termination is pretextual.

First, McKee has consistently asserted throughout this litigation that the sole reason for Jones' termination was his departure from company property on February 7th without clocking out, which McKee policy considers to be defrauding the company. All of the people deposed who participated in Jones' suspension hearing (and who ultimately made the unanimous decision to terminate him) testified at their depositions that Jones being off company property while on company time was the sole reason for their vote to

terminate his employment.[8] They also testified that Jones' FMLA status was never discussed during the suspension meeting and therefore played no role in their decision. Moreover, the undisputed evidence demonstrates that McKee policy considers being off company property while on the clock to be a serious offense, akin to defrauding the company. Therefore, McKee has established a legitimate, non-discriminatory reason for Jones' termination,[9] and Jones must now come forward with sufficient evidence that demonstrates that this reason was mere pretext.

Unlike at the *prima facie* stage, an "employee's attempt to prove pretext or actual discrimination requires more substantial evidence, however, because unlike evidence establishing the prima facie case, evidence of pretext and discrimination is viewed in light of the employer's justification." *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001).

In Jones' Response to the Motion for Summary Judgment, he contends that there is evidence demonstrating that McKee's asserted justification was pretextual because McKee treated several other similarly situated individuals differently than it treated Jones. Pointing to evidence of an employer's differential treatment of similarly situated

---

[8] As noted above, Jones' suspension committee consisted of five individuals. The record before the Court shows that four of these individuals (all but Philip Cameron) were deposed.

[9] During his suspension hearing and later during his deposition, Jones remarked only that he never recalled leaving company property on February 7th, and he asserted that Tharp and Ruebush were mistaken to think that it was him. Although there is substantial evidence to corroborate Tharp and Ruebush's accounts (including that they were there and that the electronic system record confirms that Jones swiped in and out of the building around the time that they reported seeing him do so), even if they *were* mistaken, it does not detract from the legitimacy of McKee's asserted justification. For, "if an employer bases its decision on an honestly-held belief unrelated to the FMLA, it is nondiscriminatory even if that belief is mistaken." *Hudson*, 787 F.3d at 866.

12

employees is a textbook example of how an employee can establish pretext. However, "[a]t the pretext stage, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one." *Burton v. Ark. Sec'y of State*, 737 F.3d 1219, 1230 (8th Cir. 2013) (internal quotation marks omitted). As a result, before a plaintiff may rely on similarly-situated evidence, an employee "must prove only that the other employees were similarly situated in all relevant respects." *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1085 (8th Cir. 2013) (internal quotation marks omitted). That is, "the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 994 (8th Cir. 2011) (quoting *Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 479 (8th Cir. 2004)).

This Jones has not done. Although Jones has pointed to at least three McKee employees who were not terminated even though they violated the same McKee policy, he has not demonstrated that any of these individuals shared the same supervisor (in fact—the evidence shows that they did not), has not shown that they were not on FMLA (to establish that his FMLA status was the true reason for the termination), and has not demonstrated that these individuals engaged in the same conduct *without any mitigating or distinguishing circumstances*. He only notes that these individuals were not terminated and that they also did not get a Step 4 written warning. But, there is no evidence in the record as to whether any of these individuals had previously received discipline for improperly leaving company property (as Jones had a month prior to the February 7th incident when he didn't follow proper procedures before leaving on FMLA leave), and there certainly is no evidence that these individuals, like Jones, refused to admit their

conduct. In fact, the exhibits in the record show that these individuals readily admitted their conduct, see, e.g., Doc. 20-24, pp. 2, 4. In short, Jones has not put forth sufficient evidence showing that McKee's asserted justification for Jones' termination was pretext for unlawful discrimination or retaliation against him because of his FMLA status. As a result, his claims fail, and his FMLA discrimination and retaliation claims will be **DISMISSED WITH PREJUDICE**.

There is one final matter before the Court. Because all of the remaining claims have been dismissed either voluntarily by Jones or as a result of this Opinion and Order, the Court need not decide address the impact of McKee's alleged after-acquired evidence and/or how that might limit Jones' ability to recover. In addition, because all of the pending claims have been dismissed, the three pending motions in limine, Docs. 36, 38, and 40, are **MOOT**.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that McKee's Motion for Summary Judgment (Doc. 20) is **GRANTED**. Jones' FMLA entitlement, retaliation, and discrimination claims are **DISMISSED WITH PREJUDICE**. As noted above, Jones has elected not to pursue the claim for wrongful termination under Arkansas law. That claim will be **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that Jones' Motion in Limine (Doc. 36), and McKee's Motions in Limine (Docs. 38, 40) are **MOOT**.

Judgment will enter contemporaneously with this Order.

**IT IS SO ORDERED** on this 1st day of March, 2019.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE